UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

MICHAEL BARNER,

        Petitioner,                Case No. 2:15-cv-49

v.                                 Honorable R. ALLAN EDGAR

JEFFREY WOODS,

        Respondent.
_____/

**<u>MEMORANDUM AND ORDER</u>**

        Petitioner Michael Barner filed this 42 U.S.C. § 2254 petition for writ of habeas corpus challenging his May 17, 2012, jury convictions for armed robbery in violation of Mich. Comp. Laws § 750.529, interfering with electronic communications in violation of Mich. Comp. Laws § 750.540(5)(a), possession of a firearm by a felon in violation of Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony in violation of Mich. Comp. Laws. § 750.227b.  On June 27, 2012, Petitioner was sentenced as a third habitual offender under Mich. Comp. Laws § 769.11 to terms of imprisonment of 17 years 6 months to 35 years on the armed robbery convictions, 3 years and 7 months to 10 years on the felon in possession conviction, 2 to 4 years on the interfering with electronic communication conviction, and 2 years on the felony firearm conviction.

        Petitioner argues that:

I.  The state court's adjudication that the prosecution presented sufficient evidence to sustain Petitioner's conviction was an

unreasonable application of Supreme Court precedent of *Jackson v. Virginia*, 443 U.S. 307 (1979).

II.  The state court's adjudication of the identification procedure was improper and an unreasonable application of *Neal v. Briggers*, 409 U.S. 189 (1972).

III.  (A) The state's adjudication that Defendant was not unduly prejudiced by the admission of Robert Wagner's testimony, even if it was false, was an unreasonable application of *Napue v. Illinois*, 360 U.S. 269 (1959).

(B)  The state court's adjudication that the prosecutor's commentary merely responded to the counsel's argument, and that this permitted responsive argument was an unreasonable application of *United States v. Young*, 470 U.S. 1 (1984).

(C)  The state court's adjudication that the reference was a fleeting moment in Detective Smith's testimony and briefly mentioned in closing arguments was an unreasonable application of *Wainwright v. Greenfield*, 474 U.S. 284 (1985).

IV.  (A) The state's conclusion of no prejudice for counsel's failure to investigate was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

(B) The state's conclusion that we discern no reasonable probability that this additional impeachment would have altered the outcome of Petitioner's trial was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

(C) Petitioner's claims that the state's conclusion that defense counsel was not ineffective in failing to raise a meritless motion to suppress was an unreasonable determination of the facts.

(D) The state court's adjudication that there was nothing which defense counsel could object was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

V.  Petitioner's claim for relief in habeas corpus petition on the combined effect of the prosecutor's misconduct should be reviewed de novo pursuant to *Naples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003), where the state court did not evaluate the merits of petitioner's claim.

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective. Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute. Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Recently, the Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that

3

principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner argues that insufficient evidence was presented at trial to support his convictions. The Michigan Court of Appeals rejected this claim explaining:

> Defendant challenges the sufficiency of the evidence offered to prove his identity as the person who committed the charged crimes. We review de novo a challenge to the sufficiency of the evidence. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). In doing so, we "must view the evidence in a light most favorable to the

4

prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). "The prosecutor is not required to present direct evidence linking the defendant to the crime." *People v Saunders*, 189 Mich App 494, 495; 473 NW2d 755 (1991). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted). We must also "draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id.* "The credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *Id.*

The prosecutor presented sufficient evidence to establish defendant's identity as one of the participants in the Napier Gold and Silver robbery. Upon his arrest, defendant was an occupant of a Navigator matching the description of the one seen driving away from the robbery scene. When defendant alighted from the vehicle, a black and white bandana matching that used in the robbery fell from his lap. A torn piece of blue latex, akin to the gloves worn by the robbers, was also found inside the vehicle. Defendant complains of the lack of DNA evidence tying him to the bandana and the latex glove shard. Defendant also complains about the lack of video evidence placing him in the store. The jury was presented with information that the store's antiquated video surveillance system malfunctioned and that only DNA from unknown males was found on the evidence recovered. The jury was also told that the Navigator's tires could not be matched to tread marks found in the store's parking lot because of the technically inadequate manner in which that evidence was obtained. The jury apparently found the eyewitness and accomplice testimony placing defendant at the scene more compelling than the lack of forensic evidence.

Defendant further contends that Willford fabricated his tale against him. The credibility of witnesses is a matter solely for the jury. *Wolfe*, 440 Mich 514-515. Willford positively identified defendant, his long-time friend, as the robber wearing the black and white bandana. Willford explained the absence of evidence inside the Navigator, specifically the robbery spoils and weapons, by testifying that the men moved those items into the rental car occupied by Preer, Avant, and Old School. The jury was aware of the benefit Willford received in

5

exchange for his testimony. The jury was also placed on guard that Willford's testimony was less than honest: Willford testified that he remained in the vehicle as the get-away driver because he suffered a disability. Linda, however, positively placed Willford in the store due to his unique hairstyle and because her assailant moved in an odd manner, as though from a physical disability. The jury weighed this evidence and found credible Willford's claims regarding defendant.

Defendant's most compelling challenge is to Robert's identification testimony. Robert repeatedly asserted before trial that he saw the upper part of the robber's face and would never forget it. His pretrial descriptions of the robber consistently omitted mention of any eye deformity. Rather than admit his mistake, Robert suddenly remembered at trial that defendant was wearing dark sunglasses that masked his drooping left eye. This testimony was inconsistent with White's statement upon the three men's arrest that sunglasses found in the car belonged to him. It also contradicted Linda's description of her assailant during the robbery as the one wearing the sunglasses.

The jury had information suggesting that Robert's ability to remember details of the robber's face was compromised. An officer responding to the robbery scene testified that Robert "was definitely shaken. Appeared to be scared. Almost confused at a point when trying to give me different information about what was going on and how things happened." And hearing Robert's description of events with the robber yelling in his face and holding a gun between his eyes, the jury may have believed that Robert was simply confused. The jury may also have believed that defendant's eye deformity was not always as noticeable as it was at trial, as the officer who pulled defendant from the Navigator noticed nothing unusual.

While Robert's sudden change in the description of his attacker is troublesome, we discern no error requiring reversal. Given Willford's placement of defendant at the scene and the discovery of a black and white bandana on defendant's lap, the jury could have convicted defendant even absent Robert's identification testimony.

PageID.1115-1117.

A federal court sitting in habeas corpus review of a state criminal trial is to determine whether there was sufficient evidence of the essential elements of the crime to justify *any* rational trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The

evidence is to be considered in the light most favorable to the prosecution. *Id.* It is clear that the evidence was sufficient to establish that Petitioner committed the crimes. The Michigan Court of Appeals decision was not contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or did not result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner argues that the identification procedure was improper and a violation of his Constitutional rights. Respondent argues that Petitioner procedurally defaulted this issue because the Michigan Court of Appeals determined that Petitioner failed to preserve this issue by filing a motion to suppress. As a result, the Michigan Court of Appeals reviewed the issue for plain error. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal

habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals then reviewed Petitioner's claim for plain error, finding none. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Therefore, Petitioner procedurally defaulted this claim and must show cause and prejudice to excuse his procedural default. The Michigan Court of Appeals explained why the identification procedure did not violate Petitioner's rights:

> Here, Robert testified that he had adequate opportunity to view the criminal during the offense. The robber stood in close proximity with his face near to Robert, and the witness focused on his assailant. The lighting was good and nothing impeded Robert's ability to see. See *Gray*, 457 Mich at 116, factor 2; *Kurylczyk*, 443 Mich at 306, factor 1. Approximately 30 minutes elapsed between the robbery and Robert's roadside identification of defendant. See *Gray*, factor 3; *Kurylczyk*,

8

factor 5. Robert was certain about his identification at that time and at trial. See *Kurylczyk*, factor 4. Robert's description of the robber's size, build, race, clothing, and use of a black and white bandana matched defendant's features. See *Gray*, factor 4; *Kurylczyk*, factor 3.

However, Robert failed to describe his assailant as having an eye deformity. Viewing photographs of defendant, his malady was an obvious "idiosyncratic or special feature[]" that one would expect a person in Robert's position to notice. See *Gray*, factor 8. Yet, the officer who arrested defendant did not "notice anything unusual about his face . . . at that time." And Robert had been placed "[i]n [a] critical situation[]" during which his "perception" and "memory" could have been "distorted" and affect[ed]," *Gray*, factor 7, explaining his inability to notice or remember defendant's eye deformity.

Viewing the totality of the circumstances, although the identification procedure was less than ideal, it was not so unduly suggestive that it denied defendant due process of law. Moreover, we do not conclude that the identification procedure led to the conviction of an actually innocent defendant. Defendant's accomplice placed him at the scene and defendant's vehicle contained evidence linking him to the crime (the bandana and the glove fragments). Accordingly, even if the identification procedure was improper, we discern no plain error warranting reversal.

Defendant also implies that the identification procedure was improper because counsel was not present. However, a defendant's right to counsel "attaches only to corporeal identifications conducted at or after the initiation of adversarial judicial criminal proceedings." *Hickman*, 470 Mich at 610; see also *Kirby v Illinois*, 406 US 682, 688; 92 S Ct 877; 32 L Ed 2d 411 (1972). Because adversarial judicial criminal proceedings had yet to be initiated at the time of the identification, defendant's argument fails.

PageID.1118-1119.

The standard for determining the constitutionality of suggestive identification procedures focuses on whether under the totality of the circumstances the identification was reliable. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The Sixth Circuit stated:

In circumstances where there was excellent opportunity for the victim to observe the offender and the identification was made promptly thereafter in the normal course of a police investigation, and under

> circumstances when a line-up would have been difficult or impossible,
> there is no per se violation of the due process clause of the Fourteenth
> Amendment in a one-on-one show-up.

*Hastings v. Cardwell*, 480 F.2d 1202, 1203 (1973).  Under the circumstances, the officers' actions in having the victim identify Petitioner as soon as he was apprehended on the highway did not violate Petitioner's rights.  Petitioner asserts that the identification was unduly suggestive because he was in handcuffs and surrounded by police officers at the time it was made.  However, the victim had an opportunity to identify Petitioner during the course of the criminal conduct, and was able to view and identify Petitioner soon after the criminal conduct was completed.  Moreover, under these circumstances, where no adversary judicial proceedings had been initiated, petitioner was not entitled to counsel prior to the identification.  *Kirby v. Illinois*, 406 U.S. 682 (1972).

Petitioner claims that the prosecutor committed misconduct by knowingly using false testimony, by vouching for a witness, and by improperly commenting on Petitioner's right to remain silent.  Petitioner argues that the combined effect of these errors violated his right to a fair trial.  Respondent argues that Petitioner's prosecutorial misconduct claims are barred by his procedural default in the state courts.  After noting that Petitioner procedurally defaulted these issues, the Michigan Court of Appeals reviewed the claims under a plain error analysis.  The Michigan Court of Appeals rejected Petitioner's claim that the prosecutor knowingly elicited false testimony concluding:

> Defendant contends that the prosecutor presented false testimony
> through Robert Wagner when he stated for the first time at trial that
> defendant wore dark sunglasses during the robbery.  It is possible that
> Robert concocted this story to explain away his failure to notice
> defendant's eye deformity.  Defendant correctly recognizes that a
> "prosecutor may not knowingly use false testimony to obtain a
> conviction" and that "a prosecutor has a duty to correct false
> testimony. *People v Lester*, 232 Mich App 262, 277; 591 NW2d 267
> (1998).  Defendant was not unduly prejudiced by the admission of

10

Robert's testimony, even if false. On cross-examination, defense counsel elicited Robert's testimony that he told the police that he looked directly into the robber's face and yet failed to mention that defendant was wearing sunglasses. The officer who took Robert's statement at the scene confirmed the absence of that detail from his description of the robber. Any error would therefore not warrant relief.

Defendant also suggests that the prosecutor presented false evidence to the jury by using the black and white bandana to link him to the robbery despite the lack of defendant's DNA on that object. Robert and Willford both testified that defendant was wearing the bandana. And the bandana fell from defendant's lap when he exited the Navigator. A prosecution witness specifically told the jury that defendant's DNA was not found on the bandana. It was within the jury's sole province to assess the credibility and weight of that evidence. *Unger*, 278 Mich App at 222.

PageID.1120. Similarly, the Michigan Court of Appeals rejected Petitioner's argument that the

prosecutor improperly vouched for the credibility of a witness and denigrated Petitioner.

Defendant argues that the prosecutor improperly vouched for Willford's credibility and denigrated defendant by accusing him of "lying." In closing argument and during rebuttal, the prosecutor made several comments to which defendant now objects:

Sometimes in dealing with cases like this when there are multiple people involved[,] it's a necessary evil to get cooperation from co-defendants. Quentin Willford in this case was willing to cooperate. Guess what? He's still going to prison. He's going to prison for a while, somewhere between 11 and 18 years on the minimum is what you heard him tell you. He doesn't even know what his maximum will be. So it's not as if he got some great deal and is going to walk out the door tomorrow after testifying.

* * *

Ladies and gentlemen, I'd ask you to remember one thing about what Quentin Willford said in terms of his cooperation. Part of his plea agreement is that he cooperate against all defendants, not just Michael Barner.

So to put Michael Barner as the guy in the store when he's known Michael Barner pretty much the longest of any of those guys, why

11

would he do that as opposed to putting Michael Barner maybe as the lookout or something, unless Michael Barner went into that store. It doesn't benefit Quentin Willford at all to put Michael Barner in the store as opposed to putting [Avant] in the store or [Preer] in the store, because he has to cooperate against all of them. So it doesn't – he has no reason to make up who did what as opposed in terms of who was involved where, because it doesn't benefit him at all.

Defendant complains that these statements bolstered Willford's credibility and were extremely prejudicial when taken in conjunction with various challenged statements about defendant's lack of veracity:

We have to look at the credibility of the defendant's statements to the police. We know from Quentin Willford that the parting [sic] line was supposed to be tell them you're—we were coming from Grand Rapids. Well, we know from Quentin Willford that that's not what he was telling you. That was just what they were supposed to say. . . . That's what the defendant tells the police that day.

* * *

And can you believe what the defendant told the police that he's sleeping, not only then do they finally get on the highway, but they're flying down the highway at 95 miles an hour, 100 miles an hour, . . . they ramp off. Have any of you ever fallen asleep in the car? What happens when you're driving down the highway and you ramp off? You wake up typically.

* * *

And what else do we know? We know from Shenetta Preer, whose vehicle this was, when she gave that vehicle to Stanley White. When did she say she gave that vehicle to Stanley White? That morning. So how, if she gave that vehicle to Stanley White that morning, is it possible, as the defendant wanted the police to believe, that they were in Grand Rapids the night before? It's not true. They weren't in Grand Rapids the night before.

Defendant quotes the prosecutor as proceeding to argue that defendant was "lying." That statement does not appear in the transcript.

"Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness'[s] truthfulness." *People v Bahoda*,

448 Mich 261, 276; 531 NW2d 659 (1995). In *Bahoda*, the prosecution presented the testimony of accomplices and informed the jury that the witnesses were testifying against the defendant in exchange for a plea agreement or "use immunity. *Id.* at 274-275. As in this case, the prosecutor in *Bahoda* reminded the jury of that evidence in closing argument. *Id.* at 275 n 20. The prosecutor's commentary merely responded to the defense argument that Willford was untruthful about the events surrounding the robbery. Defendant claimed that Willford lied and the prosecutor countered with reasons to infer that Willford was being honest. This was permitted responsive argument. See *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007).

We also discern no error in the prosecutor's commentary regarding defendant's credibility. "A prosecutor may . . . argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief." *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). The prosecutor argued based on the evidence that defendant's version of events could not be true. There was evidence contradicting defendant's claim that he had arrived in Grand Rapids the night before and defendant's story that he slept through the car ride on the day in question was not logical in the prosecutor's estimation. This is the type of credibility argument properly addressed in a closing argument.

PageID.1121-1122.

Similarly, Petitioner's claim that the prosecutor elicited testimony of his post arrest silence was rejected by the Michigan Court of Appeals under a plain error standard.  The Michigan Court of Appeals stated:

Benton Harbor police detective Brian Smit interviewed defendant following his arrest.  Before questioning defendant, Smit read defendant his *Miranda* rights. Defendant "signed the *Miranda* card," but also "made a statement to where he didn't want to say anything incriminating[.]" The detective explained to defendant that "he could stop answering questions at any time." After Detective Smit testified regarding the content of the interview, the prosecutor elicited the following testimony:

*Q.* How did you end the interview?

*A.* He had commented that he didn't want to say anything more or get anything mixed up, and I had told him that he was being charged with armed robbery and would be lodged at the Berrien County Jail.

Subsequently, during closing argument, the prosecutor asserted:

You heard from the police about the statement that the defendant made. What does he tell him? I don't want to incriminate myself. Why would that be a problem if you didn't do anything wrong? I don't want to say too much. How could you say too much if you were sleeping in the back of that Lincoln Navigator and don't know anything about anything? How could you say too much?

The prosecutor reiterated this logic during rebuttal:

As far as twisting the defendant's words, if you don't know anything about a robbery, you don't know where you were in Benton Harbor, how can those words be used against you? You either know something or you don't know something. The only way something's going to be used against you is if you know something. If he doesn't know anything, his words aren't going to be twisted around and he can say I don't know anything. But that's not what he said. He said some other things that day to the police.

"The United States Constitution guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *People v Shafier*, 483 Mich 205, 212; 768 NW2d 305 (2009), quoting US Const, Am V. "As a general rule, if a person remains silent after being arrested and given *Miranda* warnings, that silence may not be used as evidence against that person." *Id.* "Prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate a defendant's due process rights," as well as the defendant's right to remain silent. *Id.* at 212-213. To invoke the right to remain silent and preclude the use of that silence at trial, the defendant must make an unambiguous and unequivocal statement that he wants to remain silent or that he does not want to talk with police. *Berghuis v Thompkins*, 560 US 370, 381-382; 130 S Ct 2250; 176 L Ed 2d 1098 (2010).

Defendant's statement that "he didn't want to say anything incriminating" was not a clear and certain invocation of his right to remain silent. Defendant did not express a desire to remain silent, only to refrain from saying certain things, i.e., those things that would incriminate him. Detective Smit would have been "required to make difficult decisions about [defendant's] unclear intent." *Id.* at 382. Therefore, Detective Smit could inform the jury about defendant's

14

statement without invading defendant's constitutional rights. Detective Smit also testified that he stopped questioning defendant when he more clearly stated "that he didn't want to say anything more or get anything mixed up." Defendant's statement that "he didn't want to say anything more" reflects an unequivocal invocation of his right to remain silent. Therefore, the prosecutor should not have elicited Smit's testimony in this regard. The reference to defendant's silence was a fleeting moment in Detective Smit's testimony and was only briefly mentioned in closing argument. As such, defendant has demonstrated no prejudice requiring reversal.

PageID.1122-1124.

Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir.1993). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor.'" *Serra*, 4 F.3d at 1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

Petitioner has failed to overcome his procedural default of his prosecutorial misconduct issues in the state courts. Petitioner cannot show cause or prejudice for his default, or that a miscarriage of justice occurred. The Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal

law as determined by the Supreme Court of the United States; or result in a decision that was based

upon an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding.

Petitioner claims that he received ineffective assistance of counsel.  The Michigan

Court of Appeals considered and rejected Petitioner's ineffective assistance of counsel claims on the

merits explaining:

### A. Impeachment of Robert Wagner

The majority of defendant's complaints surround defense counsel's failure to capitalize on Robert Wagner's failure to notice defendant's obvious eye deformity and belated memory at trial that the robber wore dark sunglasses, masking any such condition. Defendant asserts that counsel should have used Robert's preliminary examination testimony to impeach his trial testimony. Counsel did impeach Robert with the description he provided to the police, which included no mention of the robber wearing sunglasses. We agree with defendant that Robert's impeachment would have been more complete had counsel also used Robert's preliminary examination testimony that he was able to identify defendant by looking at "[t]he upper part of his face" and that he "remember[ed] . . . [the robber's] eyes." Certainly, this additional impeachment would have had some impact on the jury's assessment of Robert's credibility.

We discern no reasonable probability, however, that this additional impeachment would have altered the outcome of defendant's trial. Counsel had already impeached Robert's testimony with his statement to the police. The officer who took Robert's description of the robber testified that Robert was visibly shaken and confused by the traumatic situation. This high level of emotion could innocently explain Robert's failure to notice defendant's eye deformity. See *Anderson*, 389 Mich at 211. And Willford's placement of defendant at the scene of the robbery was the most damaging evidence against him.

### B. Securing Additional Description Evidence

Defendant also challenges defense counsel's failure to secure medical records, booking pictures, and other evidence to show that he had a noticeable eye deformity at the time of the offense. Such tangible evidence would have added further support to counsel's impeachment

of Robert's identification of defendant. We agree that counsel should have investigated this issue further. Even without Robert's sudden addition of sunglasses to the robber's description, his failure to previously mention defendant's eye deformity should have been a larger point in the defense. Yet again, we discern no prejudice given the extent of the testimony provided by Willford.

### C. Jury Instruction on Eyewitness Identification

Defendant contends that counsel should have requested jury instructions regarding the unreliable nature of eyewitness identifications and the inconsistency between Robert's description of the robber and defendant's actual appearance. Counsel could have requested the court to provide M Crim JI 7.8, regarding the dependability and reliability of identification testimony. Through this instruction, the court would have specifically cautioned the jury of various factors affecting the accuracy of eyewitness identifications and directed the jury to consider inconsistencies in the eyewitness's descriptions. The court did provide the jury with generalized instructions about assessing witness credibility, including that factors that could have affected the witness's memory or perception. Given Willford's corroborating testimony, we cannot conclude that defendant was prejudiced by the court's failure to more specifically address Robert's credibility in the jury instructions.

### D. Identification Suppression

Defendant complains that defense counsel should have sought to suppress Robert's pretrial and in-court identifications because defendant's actual appearance did not match Robert's description. Inconsistencies between a witness's pretrial statements and in-court testimony go to weight, not admissibility. *People v Barrera*, 451 Mich 261, 289; 547 NW2d 280 (1996). Defense counsel was not ineffective in failing to raise a meritless motion to suppress. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

### E. Impeachment of Willford

Defendant challenges counsel's failure to discover and utilize the details of Willford's plea agreement and past criminal record to more strenuously impeach the accomplice witness's credibility. As already noted, there is no record indication that defense counsel did not know the details of Willford's plea agreement before trial. That information was actually presented to the jury and Willford's motives were placed at issue.

According to the Michigan Offender Tracking Information System, Willford had been on parole for a prior offense when he participated in the current armed robbery. See <http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=774784> (accessed December 26, 2013). In his home state of Indiana, Willford had prior convictions for selling cocaine, escape, and burglary. Indiana Department of Corrections, <http://www.in.gov/apps/indcorrection/ofs/ofs;jsessionid=3U7iDT_TlQfomQzVmu?lname=Willford&fname=Quentin&search1.x=0&search1.y=0> (accessed December 26, 2013). Willford's burglary conviction occurred less than 10 years before defendant's trial, MRE 609(c), and could have been used to impeach Willford's credibility if the court found the evidence more probative than prejudicial. MRE 609(a)(2).

The additional impeachment of Willford with his prior burglary conviction likely would not have changed the outcome of defendant's trial. Willford admitted playing a part in the current robbery, a crime that portrayed him a negative light. The jury was already on guard regarding Willford's lack of credibility given his attempts to minimize his role in the robbery in contradiction of Linda Wagner's testimony. And yet, the jury credited Willford's placement of defendant at the scene. We discern no ground for reversal under the circumstances.

### F. Objections to Prosecutorial Misconduct

Defendant also challenges defense counsel's failure to object to the prosecutor's use of defendant's silence against him, commentary on witness credibility, and use of false testimony at trial. As noted, the prosecutor should not have elicited testimony about defendant's statement invoking his right to remain silent or referenced that statement in closing argument. And there is a possibility that Robert's sudden memory that his assailant wore dark sunglasses was false. Sometimes, the decision not to raise an objection is strategic. Had counsel objected to Detective Smit's short reference to defendant's decision to invoke his right to remain silent at the end of his police interview and the prosecutor's brief reference to that improper piece of evidence, defense counsel could have drawn unwanted attention to defendant's remark. See *Bahoda*, 448 Mich at 287 n 54 ("Certainly there are times when it is better not to object and draw attention to an improper comment."). Moreover, counsel did not ignore Robert's addition of sunglasses to the robber's description. Instead of objecting, defense counsel cross examined Robert on the subject. The prosecutor

18

did not, however, improperly vouch for the credibility of the prosecution witnesses or denigrate the defense. As such, there was nothing to which defense counsel could object. Counsel was not ineffective in failing to raise frivolous objections. *Fike*, 228 Mich App at 182.

PageID.1124-1127.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).

This court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if this court determines that counsel's performance was outside that range, Petitoiner is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  Petitioner has failed to show that the Michigan Court of Appeals decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or

19

resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Accordingly, the Petition is Dismissed.

In addition, if Petitioner should choose to appeal this action, a certificate of appealability is denied as to each issue raised by the Petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could not find that a dismissal of each of Petitioner's claims was debatable or wrong. Therefore, the court will deny Petitioner a certificate of appealability.

A Judgment consistent with this Memorandum and Order will be entered.

SO ORDERED.


Dated:  6/29/2016              /s/ R. Allan Edgar
                              R. ALLAN EDGAR
                              UNITED STATES DISTRICT JUDGE

20